IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA,

MAY 23 2005

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

RAFAEL PEREZ                    )

      Petitioner,          )

                        )

    v.                         )    1:01-CR-295-002

                        )

UNITED STATES OF AMERICA         )

      Respondent.          )

---

## MOTION UNDER F.R.C.P. RULE 60(b) TO CORRECT SENTENCE

---

Docket #1:01-CR-295-002

Respectfully Submitted,

*Rafael Perez*

Rafael Rerez
Reg. #10936-067
F.C.I. Fort Dix
P.O. Box 7000
Fort Dix, N.J. 08640

## ISSUES

I.   Petitioner was given two (2) levels downward departure
     for Acceptance of Responsibility instead of the expected
     three (3) levels downward departure.


II.  Petitioner is requesting a downward departure for his
     diminished capacity under 5K1.13.


III. Petitioner provided substantial assistance to the
     government in the investigation of others that were
     violating the law but never received a downward departure
     for his assistance.

NOW COMES, the Petitioner Rafael Perez, acting pro-se and moves the Honorable Court to grant a downward departure based on his diminished capacity under U.S.S.G. § 5K2.13 and to grant the additional one (1) level downward departure for Acceptance of Responsibility, for pleading guilty in a timely fashion.

## STATEMENT OF FACTS

During the summer and fall of 2001, a confidential informant was working with the Lebanon County Drug Task Force and he made a number of controlled buys of cocaine hyrochloride (powder cocaine) and cocaine base (crack) from the defendant and/or an associate named Scott Rubendall.

The Petitioner was arrested and charged with Conspiracy to Distribute and possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846.

The Petitioner was sentenced to serve a 10 year sentence and has been incarcerated since          ,        . The Petitioner is currently housed at F.C.I. Fort Dix, New Jersey.

On October 30, 2003, the Petitioner plead guilty to a second superseding information.

## ISSUE NUMBER ONE

I.    Petitioner was given two (2) levels for acceptance of
responsibility instead of three (3) levels.


Petitioner plead guilty in a timely fashion, but he received
a two level downward departure. The Petitioner plead guilty timely
and the Government did not have to go to trial saving the government
time and Petitioner should receive the 1 level downward departure
under U.S.S.G's 3Ei.i(b).

If the Court granted the 1 level, the Petitioner would be
level 29 C.H.C. III not level 30 C.H.C. III. The punishment range
would be 108 to 135 months. The Petitioner was sentenced to 108
months.

There seems to be some confusion on the Petitioner's side as
to what level he was sentenced, because he is now in a confused
state of mind. It appears that he MAY have been sentenced on level
29. The P.S.R. states level 30, but the Court could have granted
the Petitioner the other level at sentencing.

Please accept this writer's apology if in fact the Petitioner
was given the 1 level under 3E1.1(b). At this point the Petitioner
cannot remember anything and he is having problems relaying to me
what happened. The Petitioner needs help. He is past being
knowledgeable of his surrounding and he is seeking help from the
Court.

## ISSUE NUMBER TWO

II. Petitioner is requesting a downward departure for his
    diminished capacity under U.S.S.G. § 5K2.13.


Please read Exhibit I and II of this brief and you can see
that the Petitioner was in a bad mental state, before he was
sentenced. The Court did not sentence the Petitioner until he was
ruled competent to be sentenced.

The Petitioner has been incarcerated since his arrest,
November 14, 2001. He has served 42 months plus has 6 months
"good time" for a total of 48 months. If the defendant should be
given time off for the drug school, he could have at least 60
months in on his sentence.

Please look at Exhibit III, #6, and you will see that the
government agreed not to oppose a request by the defendant, that
he receive a reasonable downward departure pursuant to U.S.S.G. §
5K2.13, on the basis that he suffered from diminished capacity
during the time of the offense.

I can not find where the defense asked the Court for a
downward departure under U.S.S.G. § 5K2.13, and his sentence of
nine years does not reflect a downward departure.

The Petitioner needs medical help, and he prays that the Court
will grant him a downward departure under U.S.S.G. 5K2.13. If
the Court grants a downward departure, the Petitioner will still
be deported back to his country and his county could assist him
with his mental problem.

## ISSUE NUMBER THREE

III. Petitioner provided assistance to the government in the
investigation of others that were breaking the law, but never
received a downward departure for his assistance, per Plea
Agreement.

The Petitioner ways that he assisted the government in
investigating others that violated the law.

When I asked the Petitioner to explain his case, through the
help of an interpreter, he became very excited, began to stutter
uncontrollably, and his facial feature became very extorted.

Unless, I can get names of people that he gave the government,
I can not be sure he assisted, but one thing I do know, if Mr.
Perez was in the same condition or worse than he is now, then he
should have NEVER been sentenced. The Petitioner has had mental
problems all his life and it is getting worse.

*Exhibit III*

5.  On October 21, 2003, a Second Superseding Information was filed charging Mr. Perez with conspiracy to distribute and possess with intent to distribute crack cocaine from dates unknown through November 13, 2001, in violation of 21 USC § 846.

6.  On October 30, 2003, the defendant pled guilty to the Second Superseding Information. Pursuant to a written plea agreement, the Government agreed to recommend a two-level reduction for acceptance of responsibility and to not oppose a request by the defendant that he receive a reasonable downward departure pursuant to USSG § 5K2.13 on the basis that he suffered from diminished capacity during the time of the offense. The Government reserved the right to make a specific sentencing recommendation to the Court. The defendant agreed to cooperate and, if the Government determines the defendant has provided "substantial assistance," it may request the Court to depart below the guideline range. Finally, the plea agreement provides that none of the above recommendations are binding upon the Court or the probation officer.

## The Offense Conduct

7.  The following information was obtained from the Government and appears consistent with investigative reports of the Drug Enforcement Administration (DEA):

8.  During the summer and fall of 2001, a confidential informant (CI) working with the Lebanon County Drug Task Force made a number of controlled buys of cocaine hydrochloride (powder cocaine) and cocaine base (crack) from the defendant and/or an associate named Scott Rubendall.

9.  On August 23, 2001, the informant purchased **.93 grams of crack cocaine** from Rubendall for $200 at Rubendall's residence. Just prior to the transaction, surveillance officers observed what they later learned was the defendant's Nissan arrive at Rubendall's residence and leave a short time later. The car was registered to Adrian Aviles.

10. On September 1, 2001, the confidential informant purchased **2.2 grams of crack cocaine and .45 grams of powder cocaine** from Rubendall. Just prior to the purchase, surveillance officers saw Rubendall come from his residence, get into the defendant's car, and circle the block. The defendant's car was observed traveling back to 226 Lehman Street, Lebanon.

2

## CONCLUSION

The Petitioner is asking the Honorable Court to grant a downward departure on the three (3) issues discussed in this brief, or in the alternate grant a hearing based on the Petitioner's medical background and the fact that he still hears voices, and needs exceptional medical help. Another option would be to grant the Petitioner a downward departure for time served and allow Homeland Security to deport the Petitioner back to the Dominican Republic.

Respectfully Submitted,


Rafael Perez
Reg. #10936-067
F.C.I. Fort Dix
P.O. Box 7000
Fort Dix, N.J. 08640

-4-

09/30/2003 14:41 TEL 9195754866        CANON                                    ☑005

**FORENSIC EVALUATION**
**Mental Health Department**
**Federal Medical Center**
**Butner, North Carolina**

| | |
|---|---|
| **NAME:** | PEREZ, Rafael |
| **REGISTER NUMBER:** | 10936-067 |
| **DATE OF BIRTH:** | 12/25/55 |
| **DOCKET NUMBER:** | 1:CR-01-295-2 |
| **DATE OF REPORT:** | 09/09/03 |

**IDENTIFYING INFORMATION:** Mr. Rafael Perez is a 47-year old, married, Hispanic male, originally from Santo Domingo, Dominican Republic. He was admitted to the Mental Health Department of the Federal Medical Center (FMC) at Butner, North Carolina, on 11/14/02 pursuant to a court order by the Honorable Yvette Kane, United States District Judge for the Middle District of Pennsylvania, ordering that Mr. Perez be committed to the custody of the Attorney General for treatment and evaluation for a period of up to four months to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to understand the nature and consequences of the proceedings against him and to properly assist in his own defense, pursuant to the provisions of Title 18, United States Code, Section 4241(d). Mr. Perez' instant charges are Conspiracy to Distribute Cocaine and Possession with the Intent to Distribute in violation of Title 21, United States Code, Section 846 which allegedly started occurring on an unknown date and ended on or about 11/13/01. There are no co-defendants with Mr. Perez on these charges. The Assistant United States Attorney assigned to this case is Christy Fawcett and Mr. Perez is represented by Lenore Smith.

Limited collateral information was available for review regarding this alleged incident and on Mr. Perez' background. This collateral information includes: Court Order dated October 31, 2002; letter from Edward J. Kosheba of the United States Probation Office of the Middle District of Pennsylvania, dated 11/26/02; Superceding information dated 09/13/02; Record of Oral Pretrial Services Report, undated; and Psychiatric Evaluation performed by A. M. Hostetter, M.D., dated 10/21/02.

In addition to this written information, telephone conversations were conducted with Ms. Fawcett; Mr. Anjel Perez, Mr. Perez' son; and Mrs. Anna Perez, Mr. Perez' wife.

Since our last evaluation, no new collateral information has been

received.

**DATES OF CONTACT\PROCEDURES ADMINISTERED**: During this evaluation Mr. Perez was interviewed individually by Adam Wooten, D.O., and Ralph Newman, M.D., Staff Psychiatrists with the aid of Spanish translators. Psychological consultation was provided by Jeff Bates, M.Ed., Psychology Intern, under the supervision of Carlton Pyant Ph.D., Staff Psychologist. Mr. Bates administered the psychological testing and the tests were interpreted by Mr. Bates and Dr. Pyant.

Other members of the Forensic Team, Correctional, and Mental Health staff also had the opportunity to observe Mr. Perez' behavior throughout the course of this evaluation. Their comments were considered prior to preparation of this report. The following procedures were administered during this evaluation:

Clinical Interviews (ongoing)
Physical Examination (11/17/02)
Electrocardiogram (12/20/02, 12/22/02)
Minnesota Multiphasic Personality Inventory-2 (Spanish Version)
    (02/19/03)
Test of Nonverbal Intelligence-3 (TONI-3) (07/13/03)
Competence Assessment for Standing Trial for Defendants with
    Mental Retardation (CAST-MR) (07/13/03)

**BACKGROUND INFORMATION**: At the beginning of the interview, Mr. Perez was informed that there were limits to the confidentially of any information that he might provide. He was advised that a written report could be sent to the Court, as well as the prosecuting and defense attorneys, detailing the results of the evaluation. He was informed that the evaluators might be subpoenaed to court to testify to their opinions. Mr. Perez has a limited comprehension of the English language. Therefore, an interpreter was utilized during this interview and the forensic warning was provided in Spanish. Mr. Perez appeared to understand the confidentiality warning.

The following information is based on Mr. Perez' personal accounts and the above referenced sources where specifically indicated. His reliability as a reporter of historical information is limited.

Mr. Perez stated that he was born in the Dominican Republic but has lived in the United States for more than 20 years. He reported that he has more than 16 siblings, but is uncertain because his father had several children out of wedlock.

Mr. Perez stated that he is one of the middle children and is unaware if his parents ever married. He also reported that his mother is deceased and his father is alive, living in New Jersey.

Mr. Perez admitted that his father and grandfather have an unspecified mental illness and that his uncle and oldest son have attempted suicide. He reported that his three sons receive SSI disability for unknown mental illnesses but denied they experience auditory hallucinations. He also stated that his wife was unable to maintain her hospital food services job because of depression. Mr. Perez described symptoms that could be consistent with dementia in a brother of about 35 years of age.

Mr. Perez' son reported that his grandfather "is in a coma, like" due to an unspecified mental illness. He further stated that his father's male relatives have difficulty "thinking clearly."

The Forensic Report from Dr. Hostetter noted that Mr. Perez reported an uncle who soiled himself and a history of mental illness in his brother, father and grandfather.

Mr. Perez reported exclusive heterosexual relationships. He stated that he has been married 28 years and lived in New Jersey with his wife, Anna, and three sons, Luis, Miguel, and Angel, at the time of the alleged offense. He also stated that he has a daughter, Brendi, who lives with her mother.

Mr. Perez reported problems with asthma, eye irritation, and recent lumbar pain. He also reported a history of gonorrhea and a history of a head injury received in a motor vehicle accident which caused him to lose consciousness. Mr. Perez denied having any medication allergies.

The wife and son of Mr. Perez reported that he has a history of asthma. They state that sometimes he has trouble finding the right words to express what he wants to say.

Mr. Perez provided some information about his past history of mental health treatment. He stated that he underwent multiple psychiatric hospitalizations in the Dominican Republic for an unspecified mental illness. He was unable to name his previous medications but believed he received a long-acting antipsychotic medication. He reported that no medications have significantly improved his symptoms. Mr. Perez also reported that he had at least two electroconvulsive treatments (ECT) in the Dominican Republic when he became so depressed that he stopped eating. It was difficult to determine whether Mr. Perez experienced two separate series of treatments or only two individual days of

treatment (ECT is commonly administered as a series of 10-15 treatments on separate days). He stated that the electroconvulsive treatments were modestly helpful in improving his mood as he was able to "eat again." He admitted to one suicide attempt, drinking poison 14 years ago, but has experienced frequent suicidal thoughts.

Mr. Perez denied a history of thought insertion, broadcasting or withdrawal. He admitted to past episodes of depression, including disturbances in sleep, energy, concentration, appetite, and psychomotor retardation. He denied past episodes of manic symptoms, including euphoric or expansive mood, decreased need for sleep, racing thoughts and marked increase in pleasurable goal-oriented behavior. He admitted to obsessive hand washing but denied it interfered with his life. He reported washing his hands up to 14 times per day and is uncertain as to the reason for this behavior. Mr. Perez denied experiencing or witnessing prior traumatic events except for a motor vehicle accident at the age of 12 when four people were killed. He admitted to occasional nightmares about the event.

Mr. Perez' wife stated that he has a long history of hearing voices and "feeling depressed." She reported that he was "normal" when taking medications but had not been on medications for several years. She stated that "normal" included a non-depressed mood, lack of crying spells, no evidence of slowed speech and no evidence of decreased energy or activity. Mrs. Perez recalled two medications that her husband previously took in the Dominican Republic: Sutinal and Feltran. She was not sure if Mr. Perez had previously received ECT.

Mr. Perez' son stated that his father complained of hearing voices even when he was not depressed. Neither he nor his mother noted a history of symptoms consistent with a manic episode.

Both the wife and son of Mr. Perez stated that they believe Mr. Perez was depressed and hearing voices while he was incarcerated in Pennsylvania on his instant charges.

The Forensic Report from Dr. Hostetter noted a recent history of liquid medication to alleviate the auditory hallucinations and treatment with a medication by injection once every three weeks.

Mr. Perez admitted to the daily use of heroin and frequent use of cocaine. He also stated that he drank alcohol two to three times each week. When asked about the volume of alcohol consumed, he reported "sometimes too much."

Page 4 of 15

According to the Pretrial Services Report, Mr. Perez used
cocaine, heroin, and marijuana on a regular basis for the past
fifteen years.

Mr. Perez claimed that he finished fifth grade. This claim is
corroborated by the Pretrial Services Report that notes an
eighth grade education. Dr. Hostetter's forensic report notes
that Mr. Perez discontinued school because of headaches and
auditory and tactile hallucinations. This information was
confirmed by Mr. Perez.

Mr. Perez reported that he had earned a driver's license,
however it was suspended for driving without insurance.

Mr. Perez reported that he had no history of military service.

Mr. Perez stated that he has held several jobs in the United
States. He reported working as a hospital food service worker,
as a clothing factory laborer, landscaper, welder, and most
recently in a chicken factory. He stated that he was frequently
fired "because of problems with my head and for throwing
things." Mr. Perez was unable to be more specific except to
state, "I was thinking one thing, then I would forget and be
thinking about another thing, and then not thinking about what I
should be thinking about." He was unable to recall why he had
been throwing items at his place of employment.

Mr. Perez reported limited social activities prior to his
arrest. He recalled enjoying, buying, and restoring cars with
his brother.

When asked about his prior criminal history, Mr. Perez reported
that he had been incarcerated on one previous occasion for a
period of 18 months. He stated that at that time, he was
arrested because he was involved in an accident while being
uninsured. On further questioning, Mr. Perez stated that his
friend possessed cocaine and this was the reason for the
confinement.

A review of Mr. Perez' criminal history, as noted in the
Pretrial Services Report, reveals an arrest on 06/23/86 on an
unspecified charge related to Narcotic Drugs. He received five
years of probation for this offense on 08/29/89. He was next
arrested on 03/12/87 charged with possession with the intent to
distribute cocaine. The disposition of this charge is
unreported. Mr. Perez was next arrested on 03/02/89 for
possession of cocaine and was sentenced on 03/03/90 to five
years of confinement. Mr. Perez was arrested again on 07/19/94

Page 5 of 15

for receiving stolen property and was sentenced on 01/09/95 to
one year of probation. He next was arrested on 08/17/96 for
possession of CDS. The matter was remanded to the lower court
and no additional information is reported. He was arrested
again on 10/14/98 for possession of CDS. He was sentenced on
02/08/99 but the sentence information is unavailable.

When asked about his instant charge, Mr. Perez was unable to
state his current charges or recall events surrounding his
arrest. More recently he has been able to state that he is
charged with serious drug charges.

According to C. Fawcett, the Assistant United States Attorney
assigned to this case, Mr. Perez appeared at a court hearing at
which he intended to plead guilty. During the hearing,
Mr. Perez was interviewed by the Judge, and during this
interview, Mr. Perez acknowledged a history of mental health
treatment but he was unable or unwilling to elaborate further.
The Judge then spoke with family members of Mr. Perez who stated
that he reported hearing voices while in jail. The judge then
ordered a competency evaluation pursuant to Title 18, United
States Code, Section 4241.

An evaluation to determine Mr. Perez' competency to stand trial
was performed on 10/17/02 by Dr. Abram Hostetter. According to
Dr. Hostetter, Mr. Perez admitted to current auditory and
tactile hallucinations and depressed mood. Dr. Hostetter also
reported a previous history of high energy states.
Dr. Hostetter opined that Mr. Perez suffered from
Schizoaffective Disorder, Bipolar Type and Substance Abuse.
Dr. Hostetter's stated opinion was that Mr. Perez was unable to
understand the nature and consequences of the proceedings
against him and was unable to assist properly in the preparation
of his defense.

**COURSE IN INSTITUTION:** Mr. Perez was admitted to the 1-E,
restricted housing unit, for observation where he underwent the
routine physical exam and laboratory studies. Admission
documents show that his height was five feet, nine inches and
his weight was 210 pounds. His temperature was 98.3 Fahrenheit,
pulse was 87 beats per minute, respirations of 18 breaths per
minute, and blood pressure was not recorded upon admission.
Subsequent measurement of blood pressure showed normal blood
pressure measurements. The medical history and physical exam
upon admission on 11/15/02 revealed history of confused
thinking, intravenous drug abuse, asthma, eye irritation, recent
lumbar pain and a history of gonorrhea. The physical
examination was notable for hyporeflexia at the patella tendons

bilaterally and poor dentition. He denied any known allergies
to medications.

Admission laboratory studies included urinalysis, complete blood
count, thyroid profile with Thyroid Stimulating Hormone (TSH),
liver profile, electrolytes, serum glucose, cholesterol, BUN and
creatinine, and screens for HIV and syphilis. All results were
negative or within acceptable limits, except for elevated TSH of
5.69. The TSH was rechecked on 12/17/02 and remained elevated at
7.59, with Total T4 4.60 and Thyroid Uptake at 49.0%).
Cholesterol and triglycerides were similarly elevated on
12/17/02 at 276 and 306, respectively. Follow-up lab testing on
12/24/02 indicated hyperlipidemia (fasting lab results:
cholesterol 289, triglycerides 254, HDL 38 [reference range
40-100]). On 01/29/03, cholesterol and triglycerides remained
elevated at 255 and 381; the TSH was within normal limits. A
PPD skin test for tuberculosis was applied on 11/14/02, and read
as positive at 20mm induration two days later. A chest X-ray on
11/19/02 was interpreted as mild Chronic Obstructive Pulmonary
Disease but no evidence of tuberculosis. An electrocardiogram
performed on 12/20/02 was interpreted as possible ischemic
changes. Subsequent EKG studies on 12/20/02 and 12/22/02 did
not indicate any evidence of cardiac disease.

On admission, Mr. Perez presented as a disheveled, adult,
Hispanic male who was quiet, tearful and dressed in
institutional clothing. He was attentive to the interview but
slow to answer questions with a markedly increased speech
latency. He did not appear to be attending to internal stimuli
during the interview. His speech was further characterized by a
slow rate, decreased volume and a monotone. Speech was free of
disorganized content but marked by occasional thought blocking.
His use of vocabulary reflected low educational achievement.
Mr. Perez described his mood at the time of examination as 'not
feeling good' and his affect was constricted except when
tearful. Thought content contained auditory hallucinations
(i.e. hearing voices) of 'come with us' and occasional tactile
hallucinations on his scalp. Mr. Perez denied thought
insertion, blocking, withdrawal or control. He was oriented to
name only and was unable or unwilling to identify the day, date,
season, his location or the reason for his being at the
institution. He was unable to perform further cognitive
testing, including a test to recall three items at three minutes
or serial three subtraction. He denied suicidal or homicidal
ideation but stated that he was not sure if he would remain free
from suicidal thoughts.

Mr. Perez was medically stable during the evaluation period. He

was diagnosed with hypothyroidism and treated with Synthroid
0.1mg by mouth each day, which was decreased to .075mg per day.
Given Mr. Perez' history of asthma and complaints of shortness
of breath, he was provided with an Albuterol inhaler.  He
complained of, and was treated for, constipation with milk of
magnesia, fibercon, dulcolax suppository and fleets enema
(constipation is associated with both hypothyroidism and
treatment with the antidepressant nortriptyline).  Mr. Perez was
treated for back pain with Tylenol.  He also complained of pedal
edema, which was treated with a diuretic, hydroclorothiazide
12.5mg by mouth each day.  This was eventually discontinued with
continued resolution of the edema.

Mr. Perez was not taking any psychiatric medications upon
admission to this institution.  He was educated about the risks
and benefits of antipsychotic and antidepressant medications. He
signed a consent form to take risperidone on 11/15/02; therapy
was started at a dose of 2mg by mouth each day on that same
date.  He was maintained on suicide watch until 11/20/02 and
released to an unlocked housing unit on 11/21/02 where he
remained for the remainder of the evaluation period.

On 11/15/02, Mr. Perez reported continued auditory
hallucinations.  He also stated "I want to go where my mother
is."  He stated that his mother was deceased.  However,
Mr. Perez denied having a depressed mood.  On 11/18/02,
Mr. Perez reported continued auditory hallucinations and
suicidal ideation.  He displayed a sad affect and psychomotor
retardation.  The Risperidone was increased to 3mg by mouth each
day.  On 11/19/02, Mr. Perez reported diminished auditory
hallucinations but remained vague about his suicidal ideation.
He was notably more organized in his thought processes.

On 11/20/02, Mr. Perez again reported diminished auditory
hallucinations and denied suicidal thoughts.  He requested the
suicide watch procedures be terminated.  His thought processes
appeared improved and there was decreased speech latency
compared to previous interviews.  Risperidone was increased to
4mg by mouth each day.

Auditory hallucinations remained decreased relative to the day
of admission on 11/21/02.  Again, Mr. Perez denied suicidal
thoughts and his thought process and speech showed remarkable
improvement compared to admission.

On 12/16/02, Mr. Perez reported depressed mood, sense of fear,
memory difficulties, decreased energy and concentration, poor
appetite, crying spells, anhedonia, and diminished motor

activity. He denied suicidal thoughts. His auditory hallucinations remained decreased. He agreed to take citalopram, an antidepressant, on 12/16/02; therapy was started at a dose of 10mg by mouth each day on that same date.

On 12/20/02 and 12/22/02, Mr. Perez complained of palpitations, dizziness and dyspnea. He was evaluated by the on-call physician who diagnosed a panic attack as there was no evidence of cardiac disease. These panic attacks resolved when treated symptomatically with Lorazepam.

On 01/12/03, Mr. Perez reported auditory hallucinations and voiced "they're coming to get me." Risperidone was increased to 5mg by mouth each day on 01/16/03. Mr. Perez was noted to demonstrate more socialization on the unit. On 01/30/03, Mr. Perez continued to complain of auditory hallucinations, depressed mood and anxiety. Risperidone was increased to 7mg by mouth each day.

Mr. Perez continued to complain about auditory hallucinations and depressed mood on 02/03/03 and his psychiatrist spoke with him about the risks and benefits of changing medications. He agreed with the treating psychiatrist's recommendation to take different medications as haloperidol and nortriptyline on 02/03/03. Haloperidol was started at a dose of 5mg by mouth each night on that same date. Nortriptyline was titrated to a dose of 100mg by mouth each day over nine days.

On 02/14/03, Mr. Perez complained of some depressive symptoms and auditory hallucinations. Haloperidol was increased to 10mg by mouth each night. Cogentin 2mg by mouth twice each day as needed was also prescribed to minimize adverse side effects from the haloperidol. The haloperidol was increased to 15mg by mouth each night on 02/20/03; it was again increased to 20mg by mouth each night on 02/26/03. Nortriptyline was increased to 125mg by mouth each night on 02/26/03.

On 03/06/03, Mr. Perez remained significantly depressed. He endorsed continued insomnia, depressed/sad mood, decreased energy, decreased concentration, and auditory hallucinations. His psychomotor activity appeared slow as judged by his gait and his increased speech latency. During the evaluation, he was tearful at times. Although he denied suicidal ideation, intent or plan, his hallucinations called him to "join us" or "come with us." Haloperidol was titrated to a dose of 20mg by mouth each night. Mr. Perez was also counseled about the advantage of adding lithium as an augmentation to his antidepressant.

**Page 9 of 15**

On 03/10/03, Mr. Perez agreed to take Lithium and this
medication was started at a dose of 600mg by mouth twice daily
and titrated up to 900mg twice daily with his most recent
Lithium level of 0.7meq/L on 05/24/03.  Nortriptyline was
gradually discontinued and replaced with Bupropion due to his
notable ongoing psychomotor retardation associated with his
depression.  His panic attacks resolved allowing discontinuation
of Lorazepam.  Citalopram was also discontinued due to lack of
efficacy.

Mr. Perez tolerated the regimen of Haldol 20mg per day, Lithium
citrate 900mg twice daily, Bupropion 150mg twice daily and
Cogentin 1mg twice daily with good compliance.  Side effects
included restlessness, constipation and mild tardive dyskinesia
with lateral jaw movements.  On this regimen his psychosis
resolved with only occasional complaints of auditory
hallucinations telling him "to leave".  He reported a marked
improvement in his depression, but continued to exhibit
psychomotor retardation, despite this subjective assessment.  No
evidence of mania was noted.

Mr. Perez continued to be described as quiet and withdrawn but
cooperative with staff.  He socialized with several other
Hispanic inmates and spent time on the recreation yard and
Spanish television room.  He did not display any significant
distress in his adjustment to the routine at this institution.
His behavior was notable for psychomotor retardation (i.e. slow
walk, slow speech) and blunted affect.  His hygiene improved
over the past four months and no longer requires staff
encouragement.  He has been compliant with institutional rules
and did not present a management difficulty to unit staff.

**PSYCHOLOGICAL TESTING:**  During the evaluation process, Mr. Perez
was administered three psychological tests.  He presented with a
cooperative attitude during the test taking process.  He did not
exhibit any difficulties with vision, hearing or motor
functioning.  However, since his primary language was Spanish,
the use of an interpreter was required.

Personality Assessment:  Mr. Perez was administered the Spanish
version of the Minnesota Multiphasic Personality Inventory-2 on
02/19/03.  The instrument is a well validated, 567 true/false
item test used to assess personality characteristics and
symptoms of mental illness.  Validity configurations reflected a
invalid protocol.  Mr. Perez over endorsed items reflective of
psychopathology.  Similar validity profiles are obtained by
individuals who are experiencing intense distress or acute
psychosis.  Those with limited education and those who failed to

understand the test instructions may also achieve similar validity scale score configurations. Given the results of the validity profile, clinical scales would not yield reliable results, thus the data was not interpretable.

<u>Intellectual Functioning</u>: On 07/13/03 Mr. Perez was administered the Test of Nonverbal Intelligence-3 (TONI-3), a language-free measure of cognitive ability (specifically abstract reasoning ability and problem solving). The TONI-3 requires the test taker to individually review a set of 45 patterns and through pointing or other nonverbal communication, select the correct response choice which completes each pattern.

Mr. Perez obtained a TONI-3 quotient of 64 which is equivalent to a percentile rank of <1, indicating he performed at or above less than 1% of the normative sample. A deviation quotient of 64 and a percentile rank of <1, descriptively indicate Mr. Perez performed Very Poorly in areas assessing his problem solving and abstract reasoning skills.

<u>Test of Mental Competence to Stand Trial</u>: On 07/13/03 Mr. Perez was administered the Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR). The CAST-MR, a 50 item test designed to assess mental competence in mentally retarded individuals. However, to validate the test, mean scores were also obtained from a group of individuals who were not mentally retarded. As expected, higher mean scores on the CAST-MR were obtained from the non mentally retarded population.

Limited collateral information regarding his educational and mental health history, along with the language and cultural barriers prevented use of the measure as it was designed. There was no evidence to conclude Mr. Perez was mentally retarded. However, the CAST-MR was employed as a screening measure to assess the type of information he could provide regarding his case. Administration of the CAST-MR to Mr. Perez required the use of a Spanish translator. Admittedly, this raises concerns about the validity of the test results when employed in this manner. However, as mentioned, the purpose of administrating the CAST-MR was to obtain any useful data regarding his competency to address the charge against him.

The CAST-MR utilizes a brief multiple choice format and the subject is asked evaluate three possible answers and select the correct response for each question. This test is divided into the following three domains: I. Basic Legal Concepts (25 items); II. Skills To Assist Defense (15 items); and III. Understanding Case Events (10 items).

09/30/2003 14:43 TEL 9185754868    CANON                                    ⅟018

Mr. Perez correctly answered 68% (17 items) of the questions
pertaining to Basic Legal Concepts. He answered 66% (10 items)
of the questions pertaining to Skills To Assist Defense
correctly.

Collateral information regarding the specifics of his arrest
were not provided, thus restricting the scoring of Domain III
(Understanding Case Events). However, Mr. Perez correctly
identified the current charge and the place where the alleged
offense occurred. Results suggests that there is a basic
understanding of his case and legal rights which can be enhanced
through education regarding the United States laws.

**IMPRESSIONS:** According to the *Diagnostic and Statistical Manual
of Mental Disorders, Fourth Edition, Text Revised (DSM-IV-TR)*,
by the American Psychiatric Association, Mr. Perez' diagnoses
are considered to be the following:

Axis I:    Schizoaffective Disorder, Depressive Type; 295.70
                (Principal Diagnosis)
           Cocaine Abuse, 305.60
           Heroin Abuse, 305.50
           Cannabis Abuse, 305.20
           Alcohol Abuse, 305.00
Axis II:  No Diagnosis, V71.09
Axis III: Asthma, Hypothyroidism, Constipation, Hyperlipidemia,
                PPD Positive with no evidence of Pulmonary
                Tuberculosis by X-ray), Mild COPD
Axis IV:  Pretrial Detainee; Limited education or occupational
                skills
Axis V:   GAF = 58 (current)
           GAF = 40 (time of past report)

Based on all of the available information, Mr. Perez is
currently suffering from a mental illness, Schizoaffective
Disorder, Depressive Type. He also has a history of cocaine,
cannabis, heroin and alcohol abuse and a history of criminal
conduct as an adult.

The essential feature of Schizoaffective Disorder is an
uninterrupted period of illness during which, at some time,
there is a Major Depressive Episode, Manic, or Mixed Episode
concurrent with at least two of the following symptoms:
delusions, hallucinations, disorganized speech, grossly
disorganized behavior, or negative symptoms. During the same
period of illness, there have been delusions or hallucinations
for at least two weeks in the absence of prominent mood
symptoms. The mood symptoms are present for a substantial

Page 12 of 15

portion of the total duration of the illness. These symptoms must not be due to substance abuse or a general medical condition. The essential features must occur within a single uninterrupted period of illness. Mr. Perez' decompensation into depression with evidence of auditory hallucinations and negative symptoms meets the criteria for this diagnosis, which is also consistent the information available from his past history. Based on the available history from Mr. Perez of his course of illness, there is evidence of psychotic symptoms in the absence of mood disturbance. The subtype Depressive Type is given to the diagnosis of Schizoaffective Disorder when there is no evidence of a prior manic or mixed episode. The prior evaluation by Dr. Hostetter noted a history of manic episodes but during his stay at this institution, Mr. Perez denied experiencing any mania in the past. Family reports are much more reliable regarding mania since many people do not consider manic symptoms problematic and actually enjoy them.

Mr. Perez also demonstrated significant problems with his mental processes, including memory, drawing figures such a clock face and following directions. These symptoms may be indicative of a cognitive disorder such as dementia, or they may be indicative of a condition called pseudodementia. Pseudodementia describes clinical features resembling a dementia and it is most often caused by severe depression, including the depression seen in schizoaffective disorder. Clinical features of pseudodementia which distinguish it from dementia include: subjective complaints of cognitive loss; patient makes little effort to perform even simple tasks; notable and pervasive affective changes; multiple "I don't know" answers, and severe memory gaps for recent and remote events. Mr. Perez demonstrated these signs and symptoms during his evaluation, which lead us to believe his cognitive dysfunction may be attributable to the severity of his depression. This is further supported by the improvement in his cognition with treatment of his depression and psychosis.

Mr. Perez' description of his substance use meets the criteria for Cocaine, Cannabis, Heroin and Alcohol Abuse. The essential feature of Substance Abuse is a maladaptive pattern of substance use manifested by recurrent and significant adverse consequences related to the repeated use of substances. There may be repeated failure to fulfill major role obligations, multiple legal problems, and repeated recurrent social and interpersonal problems. Mr. Perez' history of substance abuse is documented above.

The Court requested that we provide treatment for Mr. Perez to

determine whether there is a substantial probability that in the
foreseeable future he will attain the capacity to permit the
trial to proceed pursuant to the provisions of Title 18, United
States Code, Section 4241(d). With the current course of
treatment his psychosis is greatly improved and his depression
is gradually responding with ongoing residual symptoms including
psychomotor retardation, fatigue and impoverished speech.

It is our opinion that Mr. Perez is suffering from a mental
disease or defect that has improved with treatment to the extent
that he is now able to understand the nature and consequences of
the proceedings against him or to assist properly in his
defense. Mr. Perez is aware that his charges are serious and
that he may receive a long sentence if found guilty. With
education he understood the three pleas available to him
including guilty, not guilty and not guilty by reason of
insanity. He plans on pleading guilty and added that he plans
on telling his Judge that he is "remorseful". He was made aware
that by pleading guilty, he gives up the right to a jury trial
and the right to appeal. He was able to retain this information
after he was educated in a direct and concrete manner and made
to repeat the information. He holds no irrational beliefs
regarding his attorney, the Judge or those prosecuting him. He
is able to appreciate the adversarial nature of legal
proceedings. He appears to be able to communicate with his
attorney, but can benefit from additional time to allow his
attorney to explain concepts or testimony during the
proceedings. This recommendation is based on continued slow
thinking and psychomotor retardation. His concentration is no
longer disrupted by hallucinations. Mr. Perez' competency to
stand trial is predicated on continued medication compliance.
He may require further education by his attorney regarding
details of the court proceedings, but he is clearly opined to be
educable.

Mr. Perez is currently prescribed Haloperidol 20mg per day,
Bupropion 150mg twice daily, Lithium Citrate 900mg by mouth
twice daily, Synthroid .075mg by mouth each day, Docusate 200mg
at bedtime, and Albuterol MDI two puffs four times daily as
needed. No special precautions are required for his return to
court other than to insure medication compliance. He will
require ongoing psychiatric follow-up for monitoring of his
mental status and assessment of side effects including possible

worsening of tardive dyskinesia. He will require medical
follow-up for monitoring of his thyroid status and asthma. His
mental status is currently stable with no evidence of suicidal
or homicidal thoughts.


Adam Wooten, M.D.
Staff Psychiatrist


Ralph Newman, M.D.
Staff Psychiatrist


Carlton Pyant, Ph.D.
Staff Psychologist
Mental Health Department
Federal Medical Center
Butner, North Carolina


AW:rn:cp/hh



**Hershey Psychiatric Associates**

928 East Chocolate Avenue

Hershey, Pennsylvania 17033-1215

(717) 533-4797

Fax: (717) 533-1574

October 21, 2002

Edward J. Kosheba, Esq.
Deputy Chief U.S. Probation Officer
U.S. District Court
POB 805
Harrisburg PA 17108-0805

Re: Rafael Perez
Date of Birth: 12/25/55

Dear Mr. Kosheba:

In this report I will summarize my observations and conclusions after reviewing the records you had forwarded to me concerning Mr. Perez, and then seeing him in a psychiatric evaluation at the Federal Building in Harrisburg on October 17, 2002. Since Mr. Perez is not fluent in English, and I am not fluent in Spanish, the interview was conducted through the services of an interpreter, Jason Brown.

**BACKGROUND:**

Mr. Perez is a forty-six-year-old married man from Dominican Republic. He has been in the United States for more than twenty years, having made trips back to Santo Domingo at times.

In the records forwarded to me were notes from a physician who treated Mr. Perez in the Dominican Republic in 1998 for "symptoms of nervous depression and hearing voices." He prescribed for him two medications, whose names are not known to me because medications carry different names in different countries. Dr. Acosta noted a medication prescribed had "been able to control somewhat said nervous depression."

Mr. Perez is now being held on charges of conspiring to distribute crack cocaine. Apparently, as indicated, he will plead guilty but is willing to cooperate with the government in providing information about the unlawful activities of others.

During the time Mr. Perez has been detained and questioned, he has revealed that he has again been hearing voices. It is that information which led to your request for my evaluation of

Re: Rafael Perez
Page: 2

Mr. Perez to determine if he has a psychiatric diagnosis and whether this diagnosis renders him mentally incompetent so that he is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense. You also wanted my opinion about whether he would benefit from care and treatment of a psychiatric disorder in an appropriate setting.

It has been reported by Mr. Perez's wife and sons that he has been telling them he has been hearing voices, has been feeling nervous and has had difficulty sleeping. His wife is reported to have said that he had had psychiatric problems fifteen years ago.

## PSYCHIATRIC EVALUATION:

I interviewed Mr. Perez on October 17, 2002 at the Federal Building in Harrisburg. He was in a cell. Mr. Brown and I sat on chairs right outside his cell and were able to communicate with Mr. Perez in complete privacy. He had good eye contact with me and with Mr. Brown.

Immediately he said he thinks he needs something to help him sleep at the prison because he is having a lot of trouble sleeping.

He was unable to tell me the exact name of the prison in which he is being held. He said he has lived in New Jersey with his family. He could not give me the date when he went to prison. He did not know the exact date of the interview. He thought it was the eighth month and said it may be the year 2001.

His mood appeared to be quite grim and serious. There was no smiling throughout the entire interview. However, his answers were prompt and he was cooperative in his answers to my questions.

He told me he had been born in the Dominican Republic. He went to fifth grade in school but then dropped out because of "trouble with my head." He went on to say he had frequent headaches, would hear voices calling him, and would feel hands on his head at night.

He indicated he had been hospitalized for psychiatric problems in Santo Domingo three or four times "when things got bad". He did not know how long he had stayed in the hospital but said, "a long time." He told me he would sleep a lot because of the medications he was taking. He said the medications took his voices away. After leaving the hospital he continued to take psychiatric medication as an outpatient.

He informed me his grandfather, father and a brother have all been treated with medications for psychiatric problems.

Mr. Perez said his father is living in New Jersey. His mother died eleven years ago. He

Re: Rafael Perez
Page: 3

said an uncle had died in his sixties "because of his head." He indicated his uncle could not take care of himself and had soiled himself.

He then said one of his sons is "bad in the head also." He is Mr. Perez's eldest of four children. He is twenty-six and receives SSI benefits. He also takes medication.

At this time Mr. Perez is using no medication. He believes he needs to have medication prescribed to help him fall asleep and to suppress the voices he hears. He said he becomes very frightened at night when he hears the voices. He said the voice tells him he "must go with him."

He then told me he also has twin sons who are eighteen. They receive SSI benefits and both are on medication. However, he said now both of them have jobs. His youngest child is a thirteen-year-old girl.

His wife had been employed in a cosmetic factory but is now laid off.

Mr. Perez had a slowed quality to his speech and appeared to process questions somewhat slowly. However, he was cooperative. He appeared to have low average intelligence. He said he had taken classes to learn English but has not become good at using English.

In the past he had worked as a welder. Most recently he had been working as a landscaper.

He then told me he had taken some medication from a physician in New Jersey but did not know the name of the medication. He said he was given a pill and a liquid, which took the voices away. He then said he had also been given injections every three weeks. He did not know the name of that medication but it certainly would suggest he was given an antipsychotic medication which is frequently used for chronic psychotic conditions.

Mr. Perez said he has also been treated for Asthma and uses pills and an inhalant. Some of Mr. Perez's brothers and his oldest son also suffer Asthma.

He indicated he had never had any head injuries nor did he have any convulsive seizures. He said he had used some alcohol but had never been arrested for anything he had done while intoxicated.

He informed me he had been arrested previously. He thought perhaps two times. I would note the records you sent me indicated he had multiple episodes of arrests beginning in 1986 and continuing through 1998. He said he had been arrested for stealing a car and for possessing drugs for his own use. He had served an eighteen-month sentence on a prison farm in New Jersey.

He indicated his wife now visits him in prison regularly. She is also from the Dominican

Re: Rafael Perez
Page: 4

Republic.

Mr. Perez said he knows he has charges against him about drugs but he does not know what sentence he faces. In the past he has gone to programs for treatment of drug abuse including crack cocaine and heroin. He said he had significant withdrawal symptoms when he was arrested and put in prison. He said he was given some pills to relieve those symptoms. I had no record as to what he was given.

At the prison he is taking English classes.

He believes he has more than fourteen siblings. He said his mother had three children but his father had children to other women. He believes his brothers have not been in prison. He said some of his siblings graduated from college. He spoke of one who is an architectural engineer. He said some of his brothers have come to visit him at the prison.

He has been having some crying spells in prison. He considers his mood to be depressed.

Mr. Brown had translated for Mr. Perez previously. He indicated Mr. Perez has had some problems in comprehending and in responding when he translated for him in Court.

Mr. Perez said he always feels better when he is on medication. He said at times he forgets things and doesn't know where he is. When I again asked him for his orientation as to where he was when I was seeing him, he said he thinks he may be in Philadelphia.

His expression remained extremely flattened throughout the entire interview.

I then asked him about symptoms of hypomania or mania. He said there have been times when he has felt overly energetic. He described various relatives who get on the high side at times. He said some of his relatives also become very depressed.

His oldest son attempted suicide. One of his brothers has attempted suicide. Mr. Perez said he himself has thought of suicide.

He said there have been times he has felt much more depressed than on the day I was examining him. He said the last time he felt on the high side was a year ago when he was living with a sister in New Jersey.

He could not give me the name of his Attorney. He said he had met him only once.

It was apparent as we talked he became more depressed and discouraged. He said he continues to feel things touching his head at night and hears voices when no one is there.

Re: Rafael Perez
Page: 5

## CONCLUSIONS:

My examination of Mr. Perez consituted a Mental Status Evaluation in which I observed his posture, expression, mood, comprehension, thought processes and thought content, judgement and insight. I also evaluated his orientation and memory functions. I did not carry out any paper and pencil testing. All information was obtained through interview techniques.

Based on my review of these records, and my psychiatric evaluation of Mr. Perez, it is my professional opinion he suffers with SchizoAffective Disorder, Bipolar Type. This diagnosis indicates he has marked fluctuations in mood far beyond the mood changes of a normal person. When he becomes depressed, he also has evidence of psychotic symptoms, seen in his hearing voices and feeling sensations in his head.

Another diagnosis applicable to Mr. Perez is Substance Abuse, Narcotics. From my interview with him it is difficult to determine whether he would use substances as self-medication. He reported that he has definitely had relief of psychiatric symptoms when he has used the medication prescribed for him. The fact he was given injections of antipsychotic medication every three weeks supports the conclusion that he was seen as having a Psychotic Disorder.

With appropriate treatment, which would include antipsychotic and antidepressant medication, Mr. Perez should again be able to recover from his Psychiatric Disorder.

At this time, his psychotic symptoms and his markedly depressed mood render him Incompetent to participate in the preparation of his defense against the charges he faces. He appears unable to understand the nature and consequences of the proceedings against him and is unable to assist properly in the preparation of his defense.

He should be treated in a psychiatric facility for prisoners suffering with psychiatric disorders.

You also asked for an opinion as to whether his mental condition should affect the sentencing process for his criminal behavior. It appears Mr. Perez has had evidence of longstanding Psychiatric Disorder which has led to multiple hospitalizations as well as outpatient treatment. From what he told me, there appears to be a very significant incidence of mental illness within his family. Bipolar Disorder is an inherited condition, and Mr. Perez reported various relatives having significant Mood Disorders. This supports my conclusion that Mr. Perez has had evidence of a very serious Psychiatric Disorder which he dates back to fifth grade. This Disorder has not been consistently and adequately treated. It is reasonable to conclude his Psychiatric Disorder has been active at many of the times when he has been involved in criminal behavior.

Re: Rafael Perez
Page:  6

I trust this report will be useful to you as Mr. Perez's case moves forward.  If you have further questions for me concerning any part of this evaluation or report, please do not hesitate to contact me.

Very truly yours,

Abram M. Hostetter, M.D.

AMH/kh
AMH34/perez

## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that a true and correct copy of this foregoing instrument has been mailed postage prepaid on this _18th_ day of _May_ 2005, to the _AUSA Christy Fawcett_ At _P.O. Box 11754 Room 218 Federal Building Harrisburg, Pa. 17108_ by depositing same in the legal mail box at _FCI Ft Dix_ _New Jersey_ institution.


_Rafael Perez_
Rafael Perez
Reg # 10936-067
P.O. Box 7000
Fort Dix, N.J. 08640





Rafael Perez # 10933-067
Federal Correctional Institution
P.O. Box 7000
Ft. Dix, N.J. 08640

United States District Court
For Middle District of Pennsylvania
228 Walnut St.
Harrisburg, PA. 17108

Legal Mail

7003 2260 0007 2751 8727